STATE OF IOWA, Appellee, v. WILLIAM HESSE, Appellant.

**HOMICIDE: Manslaughter—Corpus Delicti—Evidence.** Evidence reviewed and held insufficient either to show the *corpus delicti* or to show defendant's connection with the offense, had one been shown.

*Appeal from Monroe District Court.*—HON. FRANCIS M. HUNTER, Judge.

TUESDAY; OCTOBER 19, 1915.

THE defendant was indicted for murder in the first degree and was convicted of manslaughter. He appeals.—*Reversed.*

*George H. Woodson* and *S. Joe Brown,* for appellant.

*George Cosson,* Attorney General, *John Fletcher,* Assistant Attorney General, for appellee.

LADD, J.—Two facts are essential to the conviction of any offense charged in an indictment: (1) That an offense has been committed; (2) that the person accused was in some manner connected therewith. Neither appears from the record before us. The indictment charges that the accused, on December 12, 1912, assaulted and killed Ruth Carson. A recital of the evidence will best demonstrate its insufficiency to establish the charge.

HOMICIDE:
manslaughter:
*corpus delicti:*
evidence.

Hesse lived about 40 rods north of Carson, and they had not been on good terms for years previous. At one time, they quarreled about the kind of fence Hesse was placing along the highway, Carson insisting that it should be hog

tight, and threatening that he would "kill him (Hesse) if he ever came over the fence". Owing to language then used by Hesse, Carson had him arrested; but on the following morning, upon the intercession of Hesse's daughter, agreed to his release. The families did not visit. Hesse allowed his stock to run on Carson's premises, notwithstanding his protests; and although they had had words repeatedly, Carson swore that he had never heard his wife and Hesse have any words about stock. In the morning in question, Carson and deceased left their house together, he going to the granary and she farther north to milk. She had a small woolen shawl over her head, tied to one side. He then saw defendant and Griffin driving up the road in a spring wagon. She had been out of his sight only a few minutes when Hesse, who was about 70 feet south of where deceased was, hallooed and said: "O, John, there is something the matter with your wife." Carson testified that Hesse "wanted to know what was the matter with my wife and I said I did not know there was anything the matter with her and I started to run. When I got there, she was right in there east of that cow barn. She was sitting upright. She was just in a position like that, her head was over there on that side. I called her by name, and asked her what was the matter. and she didn't answer me. I noticed when I raised her head up and left it alone it fell back on the left shoulder or right shoulder. I asked Hesse or Griffin what they had said or done to her and they said they hadn't done anything. Griffin was just over the fence in the highway. He was standing up close to the fence. I tried to pick her up and carry her to the house and I couldn't and I asked them to come over and help me carry her and Griffin came over and started to help and I asked Hesse the second time and he came over and helped us then and when he got there we carried her to the house and laid her down and got some water." Neighbors were called and a doctor summoned. The shawl was on her head as it was when she started out to milk. The milk pail was lying at her left side. There was a club

about two feet long and partly peeled off at the end lying in the highway near by, but it disappeared the following night. Carson testified that he saw a "kind of purple mark along her left side—clear along and then along, it was just like that, like you would put your hand on your cheek, like that, it was all purple just about that far back. I noticed this before the doctors came. . . . The mark I saw on the left side of my wife's face was about one of my finger's length and the flesh was not broken, it was just purple. It was colored a different color from the rest of her face. It was not bloodshot. If there had been any loud talking or holloing, I could have heard it."

The deceased was about 41 years of age and weighed about 125 pounds. The ground where she was found was nearly level. No one was near her except defendant and R. L. Griffin. The witness also testified that defendant's voice trembled, but he did not know whether it naturally did so.

There was a post mortem examination by three witnesses. Dr. Hyatt, who was coroner, testified that they "found that there had been a dislocation of the atlas upon the axis. These are the first two bones of the spinal column. The atlas is the principal bone that the skull rests on and the axis is the bone just immediately below that. . . . The axis was broken." These bones were removed and introduced in evidence, and the witness pointed out that the "odontinoid process comes right up to this strong ligament and is attached there and here is the occipital bone of the skull". He was then asked: "Take a woman of this build, in case she had a shawl tied around her head and under her chin and across and tied back around her neck, if there could be a blow struck on the left side about the back side of the neck at the end of the jaw, with a club or any other hard substance like a heavy fist that could dislocate these vertebrae in the manner you found them without leaving any great amount of outward signs of the blow?" The answer was: "I think so."

On cross-examination, the witness testified that he did not know that there would be any difference between a blow and a fall as the probable cause of such an injury, ''taking into consideration all the facts and circumstances as I found them there. Anything might produce a dislocation that might shove the head forward. . . . The fall would be about the same as any other force if it came from the side or back. I would not expect that kind of an injury so readily if the force came direct from the front or straight out to the neck of the subject. I mean by the angle that the blow would have to come with a force from the side or from the back rather than from the front to the side of the face or neck to produce such an injury. I saw no mark of outward violence on the side of the neck or face.''

Dr. Eschbach testified that he saw no discoloration about the face or neck and that ''It would be possible to cause such an injury with a blow of a fist or club. The injury might be caused by a fall or by any force which would throw the neck in a particular angle in a kind of twitch. . . . Apoplexy or hemorrhage of the brain would be likely to cause such a fall and such a fall might cause such injury.''

Dr. Hyatt, on being recalled, agreed that ''Falling in a faint or from apoplexy or from any cause might result in such an injury'' and that he had ''noticed coloring to come into the face of the dead from the failure of the arterial and venous blood to readily drain.''

Dr. Fowler saw the stick that the witness Carson spoke of and testified that ''it looked like an old stick or limb like one used for firewood''; and that the injury ''might have been caused by a blow or a fall or any force applied when the neck is in a certain position''; that he saw no marks of violence about the body except the dislocation of the neck.

At the close of the state's evidence, the defendant moved that the jury be directed to return a verdict of not guilty; but this motion was overruled and R. L. Griffin was called as a witness and testified that the deceased stopped defendant

as they were driving along and asked him to put his little
pigs up; that defendant replied that he did not know they
were running out and that he would go back at once and have
the children put them up and that he would see that they
were kept up; and that he then started toward his house,
when deceased threw up her hands, moved one of her feet as
though wishing to step forward, and fell to the ground; that
he called the accused to come quick as he believed she had
fainted; that Hesse went toward the wagon and directed
Griffin to come to her assistance; that he, Griffin, had put his
arms through the fence and raised the head and shoulders of
deceased up from the ground and that he held her in that
position until Carson came; that Hesse called Carson as
testified by him; that Hesse was never near her and that
neither of them were out of the road or touched deceased;
that there was no quarreling or manifestation of ill feeling
and nothing was done by either of them to cause her fall;
and that neither of them had the stick mentioned in the evi-
dence.    The testimony of the defendant is substantially like
that of Griffin.

Three physicians were called by the defendant and their
testimony was substantially like that of those who testified in
behalf of the state.

Such is the evidence upon which the accused was con-
victed of the crime of manslaughter, and we have no hesi-
tancy in denouncing it as utterly insufficient. It furnishes
no better ground for inferring that the dislocation of the two
vertebrae was caused by a blow than that this was in conse-
quence of a fall; and for all that appears, the conclusion that
she fell in consequence of fainting or a stroke of apoplexy is
more probable than that either Griffin or Hesse struck her,
for their innocence is presumed until the contrary is made
to appear.    The most that can be said from the record is
that the accused was so near deceased that he might have
struck her with his fist or a club, that he might have been
found to have been of bad character, and that he was at

enmity with her husband; but we are not quite ready to say that these facts alone are enough to sustain the inference that he caused her death. They merely raised a suspicion that, if she died from violence, he may have occasioned her death. But was her death due to violence from another? The record does not warrant the conclusion that this is more probable than that she died from natural causes, or that the accused was concerned directly or indirectly in causing her death.

The judgment is—*Reversed.*

DEEMER, C. J., GAYNOR and SALINGER, JJ., concur.